**CROWN HEIGHTS JEWISH COMMUNITY COUNCIL, INC. and Chevra Machziket H' Shechuna, Inc., Plaintiffs,**

v.

**David FISCHER, et al., Defendants.**

No. 92 CV 3123(NG)SMG.

United States District Court,
E.D. New York.

Aug. 10, 1999.

Peter A. Joseph, Weinstock, Joseph, Klatsky, Nisonoff & Schwartz, LLP, for plaintiffs.

Eli Feit, Heller, Horowitz & Feit, P.C., for Fischer defendants.

### ORDER

GERSHON, District Judge.

In this action brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq., and New York State law, the Fischer defendants [1] ("defendants") and the plaintiffs seek summary judgment. Their motions were referred to the Honorable Steven M. Gold, Magistrate Judge, for report and recommendation. Judge Gold, who has a thorough familiarity of this case through his supervision of lengthy pretrial proceedings and involvement in prior motions, has now filed a Report recommending that defendants' motion be granted. Judge Gold found that plaintiffs have failed to identify admissible evidence sufficient to raise genuine questions of fact for trial with respect to their claims that defendants violated RICO and that the remaining claims, brought under the court's supplemental jurisdiction, should be dismissed without prejudice. For the reasons stated below, the Report and its recommendations are adopted in their entirety.

Before the magistrate judge plaintiffs principally relied on summaries and purported quotations from depositions set forth by their attorney, Peter A. Joseph, Esq., in a 134–page affidavit. They did

---

**1.** The "Fischer defendants" include defendant David Fischer as well as the following: BNZL Westchester, Ltd., Crown Montgomery Homes, Inc., Crown Realty Co., Empire Realty Co., Galoth Realty Corp., Givoh Associates, Habracha Associates, K.Z.H.B. Associates, Nachla Realty Associates, Rachamin Realty Associates, Shipur Hashchuna Realty Corp., Shipur Hashchuna Management Corp., Shipur H'Shechuna Corp., Tref Realty Corp., and 5742 Realty Associates.

not present to Judge Gold the depositions themselves; nor did they submit the central documents upon which they rely, with authenticating affidavits. Despite plaintiffs' unfounded claims to the contrary, the materials submitted to Judge Gold, are, for the most part, without evidentiary value and are insufficient under Rule 56 of the Federal Rules of Civil Procedure to defeat what Judge Gold correctly found to be the evidentiary showing made by the defendants that a RICO claim could not be established. Judge Gold set forth the applicable law with clarity and then carefully and exhaustively analyzed the plaintiffs' contentions that there is an evidentiary basis for their RICO claims which requires a trial. Indeed, even though the plaintiffs are proceeding with counsel, and not *pro se,* Judge Gold has given them every possible opportunity to meet the showing made by the defendants. For example, he allowed them to answer the motion some nine months after it was brought, and he reviewed transcripts of depositions which plaintiffs claim support them, even though the plaintiffs had failed to submit those transcripts.

Judge Gold properly rejected plaintiffs' claim that his rulings on discovery excused them from submitting deposition transcripts. Plaintiffs claim that defendants had the burden of submitting accurate copies of the deposition transcripts upon which *plaintiffs* rely. Such a claim has no basis in law, nor in any of the rulings made by Judge Gold to accommodate the plaintiffs by requiring the defendants to make available to plaintiffs any transcripts upon which *defendants* were relying.

Turning to the merits, Judge Gold found that:

This Court's concern with plaintiffs' failure to support their opposition to summary judgment with deposition transcripts is substantive as well as procedural. To the limited extent that, although not submitted by plaintiffs, the actual transcripts of the testimony cited in the Joseph affidavit have been made available to the Court, comparisons between the testimony "quoted" in the Joseph affidavit and the original transcripts reveals that significant words have been omitted, sentences have been quoted out of order, and statements have been taken out of context.

Report at 19. Judge Gold then proceeded to analyze each of plaintiffs' claims in detail, noting that either there is a total failure of proof or that the claimed proof, upon examination, does not support the plaintiffs' position. Among other things, he correctly found that findings in other cases which plaintiffs claim are usable against the defendants under the doctrines of res judicata or· collateral estoppel are not determinative of the issues presented in this case.

In plaintiffs' objections to the Report, they continue to rely on the inadmissible Joseph affidavit's hearsay allegations as to the content of depositions. As before, plaintiffs rely on unsupported allegations of fact, proffer as facts grossly misleading characterizations of the evidence, challenge the credibility of witnesses whose depositions are relied upon by the defendants without offering countervailing admissible proof, and refer to still further inadmissible evidence such as newspaper articles.

In addition, they now point to what they claim is additional evidence of the defendants' wrongdoing and ask the court to consider it even though it was not presented to Judge Gold. Plaintiffs claim that they should be permitted to supplement the record and, finally, offer what they assert will be evidentiary facts to defeat the summary judgment motion. They offer no sound basis in support of supplementation. For example, they suggest that, since the complaint refers the court to "the public record" of various deeds and mortgages, they "were uncertain whether or not the Magistrate in such an instance, would appoint a master to investigate the records in question," *see* Letter of Peter A. Joseph, Esq., dated December 11, 1998, and use

this as an excuse for why they did not previously produce the deeds and mortgages themselves. Their claim that they were prejudiced by Judge Gold's failure to rule on a contempt motion for sanctions against the defendants and other parties and non-parties made in early 1997 is equally meritless. Even assuming *arguendo* that the motion was not fully resolved (*but see* Docket Entry # 185 of April 10, 1997), its lack of resolution was never presented to Judge Gold as a basis for denying defendants' motion for summary judgment. That is, plaintiffs neither claimed that resolution of the contempt motion for sanctions was necessary to their ability to respond to the motion for summary judgment, nor did they claim that the absence of particular discovery prejudiced their ability to respond to the motion. On the contrary, plaintiffs themselves moved for summary judgment on the ground that the facts prove defendants' liability.

■ Given the history of this case, it would be an abuse of the invaluable role played by magistrate judges in reviewing dispositive motions to reopen the record to give plaintiffs yet another opportunity to fulfill their obligation to submit admissible evidence. This court's review of a magistrate judge's report and recommendation is *de novo,* and the court is permitted, in its discretion, to accept supplemental evidence. *See* 28 U.S.C. § 636(b)(1); Fed. R.Civ.P. 72(b); *Hynes v. Squillace,* 143 F.3d 653, 656 (2d Cir.1998), *cert. denied,* —— U.S. ——, 119. S.Ct. 246, 142 L.Ed.2d 202 (1998). But it is well established that the court may also decline to exercise its discretion to allow such supplementation. Thus, the Second Circuit in *Hynes* noted that:

> [W]e have upheld the exercise of the district court's discretion in refusing to allow supplementation of the record upon the district court's de novo review. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir. 1994) (finding no abuse of discretion in district court's refusal to consider sup-

plemental evidence); *Pan American World Airways, Inc. v. International Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (holding that district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *see also Wallace v. Tilley,* 41 F.3d 296, 302 (7th Cir.1994) ("It is not in the interests of justice to allow a party to wait until the Report and Recommendation or Order has been .issued and then submit evidence that the party had in its possession but chose not to submit. Doing so would allow parties to undertake trial runs of their motion, adding to the record in bits and pieces depending upon the rulings or recommendation they received.") (internal quotation marks and citations omitted).

143 F.3d at 656. As similarly noted in *Paterson–Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.,* 840 F.2d 985 (1st Cir.1988):

> Systemic efficiencies would be frustrated and the magistrate's role reduced to that of a mere dress rehearser if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round. In addition, it would be fundamentally unfair to permit a litigant to set its case in motion before the magistrate, wait to see which way the wind was blowing, and—having received an unfavorable recommendation—shift gears before the district judge.

840 F.2d at 991. Here, plaintiffs offer no sound basis for reopening the record. The request to reopen is denied.

## CONCLUSION

■ For the above-stated reasons, I adopt Magistrate Judge Gold's Report and Recommendation in its entirety and direct that the Complaint against the Fischer defendants be dismissed.

**SO ORDERED.**

*REPORT AND RECOMMENDATION*

GOLD, United States Magistrate Judge.

### Introduction

Plaintiffs, the Crown Heights Jewish Community Council, Inc. (the "Council") and Chevra Machziket H'Shechuna, Inc. ("CMH"), bring this action pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, alleging that, together with others, defendant David Fischer engaged in a scheme to defraud plaintiffs in connection with various real estate transactions involving property in the Crown Heights section of Brooklyn, New York.[1] Plaintiffs also claim, pursuant to New York State law, that defendant Fischer breached a fiduciary duty he owed to them, and that Fischer committed various state law crimes, including grand larceny, falsification of business records, and filing of false instruments.

The "Fischer Defendants"[2] now move for summary judgment, claiming that plaintiffs have failed to raise a genuine issue of material fact for trial and that defendants are therefore entitled to judgment as a matter of law. Defendants also seek dismissal of the complaint pursuant to Federal Rule of Civil Procedure 37, arguing that plaintiffs have failed to comply with proper discovery demands and have provided false and misleading disclosure to defendants. Finally, defendants seek an order dismissing the complaint on the grounds that plaintiffs lacked the requisite authority to bring this lawsuit, and an order disqualifying the law firm of Israel Weinstock from representing plaintiffs in this action based on that firm's alleged violation of Disciplinary Rule 5–105.

Plaintiffs cross-move for summary judgment, claiming that the evidence relied upon by defendants in support of their motion fully proves the allegations of plaintiffs' complaint. *See* Aff. of Peter A. Joseph in Opp'n to "Fischer Defs.'" Mot. for Summ.J. and in Support of Pls' Cross–Mot. For Summ.J. ¶ 1(ii) ("Joseph Aff."). Plaintiffs also seek sanctions against defendants' counsel, pursuant to Federal Rules of Civil Procedure 56(g) and 11(c), claiming that defendants' attorney Eli Feit submitted his affidavit in support of defendants' motions in bad faith.

### Procedural History

The complaint in this case was filed on July 2, 1992. On August 28, 1992, defendants moved to dismiss the complaint on a variety of grounds, including their contention that plaintiffs' RICO claims were time-barred because they were not brought within the applicable four-year statute of limitations. Defendants also sought to strike various portions of the complaint, to disqualify plaintiffs' counsel, and to impose sanctions on plaintiffs. *See* Defs.' Notice of Motion, Docket Entry 7.

On September 4, 1992, United States District Judge Carol B. Amon referred defendants' motion to dismiss to the magistrate judge then assigned to this case for report and recommendation.[3] On July 7, 1994, I issued a report recommending that the case be dismissed on the ground that plaintiffs' RICO claims were time-barred. I did not reach the other grounds for

1. This Report assumes familiarity with the facts of this case, which are discussed in greater detail in this Court's Report and Recommendation dated July 7, 1994. *See* Docket Entry 44.

2. The terms "Fischer Defendants" and "defendants" refer to defendant David Fischer as well as to the following entities: BNZL Westchester, Ltd., Crown Montgomery Homes, Inc., Crown Realty Co., Empire Realty Co., Galoth Realty Corp., Givoh Associates, Habracha Associates, K.Z.H.B. Associates, Nachla Realty Associates, Rachamin Realty Associates, Shipur Hashchuna Realty Corp., Shipur Hashchuna Management Corp., Shipur H'Shechuna Corp., Tref Realty Crop., and 5742 Realty Associates.

3. This case was originally assigned to District Judge Amon and Magistrate Judge Carter. The case was then reassigned to District Judges Seybert, and subsequently to District Judge Gershon, and I was assigned as the magistrate judge.

dismissal advanced by defendants. By Memorandum and Order dated July 3, 1995, United States District Judge Joanna Seybert declined to adopt the report and recommendation and denied defendants' motion in its entirety.

The parties engaged in extensive discovery from July 1995 until April 1997. On June 16, 1997, the Fischer Defendants filed the motion for summary judgment now pending before the Court. *See* Docket Entry 216. Plaintiffs did not serve their opposition to defendants' motion, or their own cross-motion for summary judgment, until March 16, 1998, and these documents were not filed with the Clerk of the Court until May 7, 1998. *See* Docket Entry 221.

For the reasons stated below, I respectfully recommend that defendants' motion for summary judgment be granted. I therefore do not reach the other pending motions.

### *Discussion*

Plaintiffs, invoking this Court's federal question jurisdiction pursuant to 28 U.S.C. § 1331, allege in this action that defendants have violated RICO, and seek relief in the form of treble damages and attorney's fees pursuant to 18 U.S.C. § 1964(c). The Fischer Defendants contend that, despite four years of discovery, plaintiffs are unable to point to any admissible evidence to support the central allegations of their complaint. *See* Aff. of Eli Feit in Supp. of Mot. for Summ.J. and Other Relief ("Feit Aff.") ¶¶ 3–4. Specifically, defendants contend that plaintiffs have failed to come forward with any admissible evidence indicating that defendants in fact engaged in a "pattern of racketeering activity" by committing the underlying predicate acts charged in the complaint. Defendants further contend that plaintiffs lack standing because they are unable to demonstrate that they suffered any particular injury to their business or property which was proximately caused by defendants' conduct. Thus, defendants argue, no genuine issue of material fact remains for trial, and they are entitled to judgment as a matter of law.

### A. Elements of a RICO Claim

 To maintain a civil RICO claim, a plaintiff must establish: 1) that a RICO "enterprise" existed; 2) that the defendant committed predicate acts falling within one or more of the categories enumerated in Section 1961; 3) that these predicate acts constituted a "pattern of racketeering activity;" and 4) that there is a nexus between the defendant, the pattern of racketeering activity, and the enterprise. *See* 18 U.S.C. §§ 1961, 1962; *Bernstein v. Misk,* 948 F.Supp. 228, 234 (E.D.N.Y. 1997). Further, plaintiffs pleading a RICO violation must demonstrate standing, by showing that they were injured in their business or property, and that these injuries were proximately caused by the conduct constituting the alleged pattern of racketeering activity. *See* 18 U.S.C. § 1964(c); *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 1317, 117 L.Ed.2d 532 (1992); *Bernstein,* 948 F.Supp. at 234.

 A "pattern of racketeering activity" consists of at least two predicate racketeering acts, occurring within ten years of each other. *See* 18 U.S.C. § 1961(5). Violations of any of a wide variety of state and federal laws may qualify as "racketeering activity" under the RICO statute. *See* 18 U.S.C. § 1961(1). Plaintiffs in this case assert that defendants have engaged in racketeering activity by violating the mail fraud statute, 18 U.S.C. § 1341, and by conducting monetary transactions in property derived from "specified unlawful activity" in violation of 18 U.S.C. § 1957. *See* Compl. ¶¶ 151, 152, 161–63, 175–77, 188–90, 216–18.

 Plaintiffs also assert that defendants have engaged in racketeering activity by violating 18 U.S.C. § 1014. *See* Compl. ¶¶ 162, 176, 189, 217. However, no such section exists in Title 18, nor is there any reference to Section 1014 in the RICO

statute. Although it appears that plaintiff may have intended to refer instead to Section 1014, which relates to fraudulent loan or credit applications, a violation of that Section does not constitute a racketeering offense under Section 1961. However, a violation of Section 1014 may form the basis for a RICO complaint to the extent that it constitutes "specified unlawful activity" giving rise to a violation of Section 1957. *See* 18 U.S.C. § 1957(a) (requiring that the criminally derived property in issue be derived from "specified unlawful activity"); § 1957(f)(3) (stating that the term "specified unlawful activity" has the meaning given to the term in Section 1956); § 1956(c)(7)(D) (including violations of Section 1014 in its definition of "specified unlawful activity").

■ In addition to the violations of federal law described above, plaintiffs contend that defendants engaged in various acts prohibited under New York State law that constitute further "racketeering activity" under Section 1961(1). Specifically, plaintiffs claim that defendants committed grand larceny in the first degree in violation of New York Penal Law Section 155.42; falsified business records in violation of New York Penal Law Section 175.10; and offered false instruments for filing in violation of New York Penal Law Section 175.35. *See* Compl. ¶¶ 164–168. However, the only state law crimes which constitute predicate acts of racketeering activity under Section 1961 are those acts "chargeable under State law and punishable by imprisonment for more than one year," which involve "murder, kidnaping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical." 18 U.S.C. § 1961(1)(A). None of the state law crimes enumerated by plaintiff

fall within this definition.[4] Nor do any of these state law offenses constitute "specified unlawful activity" as defined by Section 1956(c)(7). Accordingly, the only viable predicate acts of racketeering activity charged in the complaint are the alleged violations of Sections 1341, pertaining to mail fraud, and 1957, pertaining to monetary transactions in property derived from specified unlawful activity.

### 1. Section 1341: Mail Fraud

■ To prove that defendants committed mail fraud in violation of 18 U.S.C. § 1341, plaintiffs must show the following: 1) the existence of a scheme or artifice to defraud; 2) defendants' knowing or intentional participation in the scheme; and 3) use of the mails in furtherance of the scheme. *See S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir.1996) (citing *United States v. Gelb*, 700 F.2d 875, 879 (2d Cir.1983), *cert. denied*, 464 U.S. 853, 104 S.Ct. 167, 78 L.Ed.2d 152 (1983)); *Congregacion de la Mision Provincia de Venez. v. Curi*, 978 F.Supp. 435, 445 (E.D.N.Y.1997). To establish intent, plaintiff must demonstrate that some actual harm or injury was contemplated by the schemer. *See United States v. Chandler*, 98 F.3d 711, 714 (2d Cir.1996); *In re Seizure of All Funds in Accounts in Names Registry Pub. Inc.*, 68 F.3d 577, 580 (2d Cir.1995). Although intent may be inferred from circumstantial evidence, *see S.Q.K.F.C. Inc.*, 84 F.3d at 634; *United States v. William Savran & Assocs., Inc.*, 755 F.Supp. 1165 (E.D.N.Y. 1991), acts done inadvertently or in good faith do not constitute mail fraud. *See O'Malley v. New York City Transit Auth.*, 896 F.2d 704, 706 (2d Cir.1990).

---

4. Plaintiffs' allegation that defendants committed grand larceny does not constitute a charge of robbery. "Robbery" is defined by New York law as "forcible stealing" involving the use or threat of "physical force upon another person." *See* N.Y.Penal Law § 160 (McKinney 1988); *see also United States v.*

*Gonzalez*, 21 F.3d 1045, 1047 (11th Cir.1994) (finding state law definition of robbery applicable under RICO statute). Plaintiffs in this case have not alleged any use or threat of force, and therefore cannot claim that defendants committed robbery.

### 2. Section 1957: Monetary Transactions in Property Derived from Specified Unlawful Activity

 In addition to their allegations of mail fraud, plaintiffs contend that defendants engaged in racketeering activity by committing violations of Section 1957. To establish that defendants have engaged in money laundering activity prohibited by Section 1957, plaintiffs must prove 1) that defendants knowingly conducted a monetary transaction in criminally derived property; 2) that the property had a value greater than $10,000; and 3) that the property was in fact derived from "specified unlawful activity." *See* 18 U.S.C. § 1957(a).

 In this case, plaintiffs' allegations of "specified unlawful activity" include mail fraud, which as indicated above is itself a RICO predicate act, *see* 18 U.S.C. § 1961(1), and may also form the basis of a money laundering charge. *See* 18 U.S.C. § 1956(c)(7)(A) (listing violations of RICO as "specified unlawful activity"). Plaintiffs' allegations of "specified unlawful activity" also include violations of 18 U.S.C. § 1014, *see* 18 U.S.C. § 1956(c)(7)(D) (listing a violation of Section 1014 as a specified unlawful activity for money laundering). Section 1014 makes it unlawful for a person knowingly to make a false statement to a financial institution for the purpose of influencing a financial institution's decision. However, the false statement need not be material. *See United States v. Wells,* 519 U.S. 482, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997).

As discussed above, violations of Section 1014 do not by themselves qualify as RICO predicate acts. *See* 18 U.S.C. § 1961(1); *see also Meridian Mortgage Corp. v. Spivak,* No. Civ.A 91–3932, 1993 WL 193364, at *8 n. 4 (E.D.Pa.1993). Therefore, to maintain a RICO claim against defendants, plaintiffs must prove not only that defendants violated Section 1014, but also that defendants knowingly engaged in a monetary transaction with property derived from that unlawful conduct in violation of Section 1957.

### B. The RICO Violations Charged in the Complaint

The racketeering allegations in the complaint provide the context in which the sufficiency of plaintiffs' showing in opposition to defendants' motion for summary judgment must be evaluated. According to the complaint, CMH and the Council are New York not-for-profit corporations dedicated to meeting the housing needs of residents of the Crown Heights section of Brooklyn. *Compl.* ¶¶ 5–6. Fischer was hired as a salaried officer of plaintiff CMH in 1975, and appointed its executive director in 1977. *Compl.* ¶¶ 35, 38. In 1980, Fischer became the Council's Chief Administrator, and was placed in charge of its community housing programs. *Compl.* ¶ 41.

The specific charges underlying plaintiffs' RICO claims arise from defendant Fischer's alleged fraudulent conduct while holding management positions with the plaintiff entities. Plaintiffs charge in their complaint that Fischer abused his positions with them by embezzling grant funds awarded to them by government agencies, and by converting real estate donated to them for charitable purposes. *Compl.* ¶ 1. Plaintiffs tie these allegations to their RICO claim by asserting that defendants used the mails in furtherance of their embezzlement of grant funds and conversion of real property, and engaged in a series of financial transactions involving the proceeds of their frauds. *Compl.* ¶¶ 151–152.

The fraudulent schemes charged in the complaint are described in detail in this Court's prior Report and Recommendation at 8–14, and are summarized only briefly here. With respect to the alleged conversion of real estate, plaintiffs allege that various individuals donated real property to them. Although Fischer was authorized to designate entities of his own choosing to take title to the donated real estate, plaintiffs were to retain their beneficial interest in the donated properties. *Compl.* ¶¶ 42–

43. Plaintiffs charge in their complaint that Fischer used his position to acquire real properties donated to them or acquired with their funds, yet placed title to these properties in the names of corporations and partnerships which he controlled, and through which he, rather than plaintiffs, acquired a beneficial interest in the properties. Plaintiffs further contend that Fischer then defrauded them by wrongfully retaining for his own benefit the income earned by these properties, as well as the proceeds generated when they were sold or mortgaged. As the alleged beneficial owners of the subject properties, plaintiffs claim that these funds properly belonged to them.

Although a large number of properties are referred to throughout the complaint, plaintiffs focus their particular attention upon five allegedly fraudulent transactions. For example, plaintiffs contend that Fischer acquired real property at 466 Albany Avenue in Brooklyn with plaintiffs' funds, and negotiated a reduced price by representing that he was acting on plaintiffs' behalf. Plaintiffs further allege that Fischer caused title to the property to be placed in his own name, and has fraudulently retained the income, rents and profits since generated by the property. *Compl.* ¶¶ 90–92. The complaint makes similar allegations with respect to the remaining four properties. *Compl.* ¶¶ 93–120.

As noted above, the complaint also charges that Fischer used his positions with plaintiffs to embezzle grant funds awarded to them by government agencies and intended to be used for charitable purposes. More specifically, the complaint asserts that plaintiffs were awarded approximately twenty million dollars in grants pursuant to a variety of federal, state and city programs, that Fischer falsely represented to the granting agencies that the funds would be used in connection with properties managed by plaintiffs, and that Fischer then fraudulently

converted virtually all of these funds to his own use. *Compl.* ¶¶ 60–63.

### C. Summary Judgment

It is well-settled that a party seeking summary judgment must establish that there is no genuine issue of material fact in dispute and that the moving party is therefore entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). Further, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

If the moving party discharges its burden of proof under Rule 56(c), "[t]he non-moving party has the burden of coming forward with 'specific facts showing that there is a genuine issue for trial.'" *Phillips v. Kidder, Peabody & Co.,* 782 F.Supp. 854, 858 (S.D.N.Y.1991) (quoting Fed. R.Civ.P. 56(e)). Further, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and summary judgment is appropriate. *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356 (quoting *First Nat'l Bank of Ariz. v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)).

To establish that a genuine issue of material fact exists for trial, "Rule 56(e) ... provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading." *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. Nor may the nonmoving party simply raise doubts

as to the veracity of the moving party's assertions. *Claudio v. United States*, 907 F.Supp. 581, 584 (E.D.N.Y.1995). Rather, to defeat a properly supported motion for summary judgment, the non-movant must make an affirmative showing of sufficient evidence of specific facts that would enable a jury to return a verdict in the non-movant's favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11.

The manner in which plaintiffs have submitted their evidence in opposition to defendants' motion requires some discussion of the form of evidentiary showing required to defeat a motion for summary judgment. Rule 56 provides that the parties may submit affidavits, depositions, or answers to interrogatories to support or oppose a motion for summary judgment. The rule goes on to require that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). In addition, "[s]worn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith." *Id.* Further, in this District, the requirements of Rule 56 are supplemented by Local Civil Rule 56.1, which directs each party to submit a statement of material facts and to follow each statement "by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)." Local Civil Rule 56.1(d).

 Hearsay testimony contained in an affidavit may not be considered on summary judgment unless it would be admissible a trial pursuant to one of the exceptions to the hearsay rule. *See H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454–55 (2d Cir.1991); *see also Beyah v. Coughlin*, 789 F.2d 986, 989 (2d Cir. 1986). Of course, "[t]o the extent that a Rule 56(e) affidavit contains inadmissible hearsay which references other evidence that is properly before the court, the court

may disregard the hearsay but separately consider the admissible evidence." *Hollander v. American Cyanamid Co.*, 999 F.Supp. 252, 256 (D.Conn.1998) (citing *John Hancock Property and Cas. Ins. Co. v. Universale Reinsurance Co., Ltd.*, 147 F.R.D. 40, 45 (S.D.N.Y.1993). Similar requirements govern consideration of documents submitted in connection with a motion for summary judgment. If either party seeks to have a court consider documents which are not yet part of the Court's record, the documents must be attached to and authenticated by an appropriate affidavit, and the affiant must be a competent witness through whom the document could be received in evidence at trial. *See Northwestern Nat'l Ins.*, 15 F.3d at 662; 11 James Wm. Moore et al., Moore's Federal Practice § 56.14[2][c], at 56–183 (3d ed.1997).

 Thus, an affidavit submitted by a party's attorney, not claimed to be based on personal knowledge, will generally be insufficient to defeat a properly supported motion for summary judgment. *See Randell v. United States*, 64 F.3d 101, 109 (2d Cir.1995) (finding affidavit submitted by party's attorney to be insufficient to defeat a motion for summary judgment because it was not based on personal knowledge); *see also Northwestern Nat'l Ins. Co. v. Baltes*, 15 F.3d 660, 662 (7th Cir.1994) (finding that attorney's submission of unsworn and uncertified documents with his affidavit, which itself was not based on personal knowledge, was insufficient to overcome motion for summary judgment).

Defendants have submitted an affidavit of defendant Fischer in support of their motion. In his affidavit, Fischer denies having embezzled or converted funds from plaintiffs, and asserts that he purchased the real properties in issue for his own investment purposes with funds he raised by legitimate means. More specifically, Fischer states:

> Beginning in approximately 1982, I also worked on a volunteer basis with the

Crown Heights Jewish Community Council ("Council") pressing its leadership to lobby various Government Agencies to make available its resources to the Crown Heights Community, and urging the Council to support the private person development and restoration of the housing stock in Crown Heights. I and others in Crown Heights looked to the Council as a representative of the Community, which could help get the message across to our elected officials that affordable housing was the key to saving our neighborhood. However, in buying properties, I at all times was working in my own private business venture, on my behalf and on behalf of my investment partners at that time.

I never converted or embezzled any funds ... from the Crown Heights Jewish Community Council or CMH. I purchased each of the properties which plaintiffs claim in this Complaint with my own funds, or funds that I borrowed, or with monies obtained from investment partners ... I never acted as agent or in any other capacity for the Council or CMH in buying the properties. No one from the Council or CMH asked that I buy the properties. No financing, loan or other form of consideration was given, or extended to me by the Council or CMH for the purchase of the properties.

Fischer Aff. ¶¶ 4–5. Defendants have thus put forth admissible testimony that the transactions described in the complaint were legitimate and not, as plaintiffs contend, frauds transacted in furtherance of a racketeering conspiracy.

Federal Rule of Civil Procedure 9(b) requires that the circumstances constituting an alleged fraud be pled "with particularity." Fed.R.Civ.P. 9(b); *see also Congregacion de la Mision*, 978 F.Supp. at 446. Accordingly, to survive defendants'

motion, plaintiffs must now come forward with some evidence which would be admissible at trial and which is sufficient to raise a genuine issue of fact with respect to whether Fischer committed the particular frauds alleged in the complaint.

## D. Plaintiffs' Evidence of Fraud

### 1. Plaintiffs' Improper Presentation of the "Evidence"

Plaintiffs have submitted a statement of disputed facts pursuant to Local Civil Rule 56.1. However, they have completely failed to comply with Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1(d), which require that a statement of disputed facts include citations to supporting evidence which would be admissible at trial. The citations in plaintiffs' Rule 56.1 statement are not to admissible evidence as these rules require, but are instead references to a 134–page affidavit of plaintiffs' counsel, Peter Joseph, dated March, 16, 1998, and certain exhibits annexed to it.

In his affidavit, Mr. Joseph repeatedly refers to the deposition testimony of various witnesses in this case.[5] Plaintiffs have failed, however, to submit the deposition transcripts, or pertinent portions of them, to the Court, choosing to rely instead on summaries and quotations of testimony set forth by Mr. Joseph in his affidavit. Mr. Joseph's affidavit also includes a list of deeds and mortgages which he asserts may be found in Kings County title records (Joseph Aff. ¶ 145), but plaintiffs have not presented the Court with the underlying documents referred to in the Joseph affidavit or with authenticating affidavits. Similarly, Exhibit A to the Joseph Affidavit, which plaintiffs label as "Schedule I," lists and selectively quotes from approximately 300 letters, deeds, checks, and other documents apparently produced during discovery. However, plaintiffs have again failed to provide the Court with the docu-

---

5. The witnesses whose testimony is cited in the Joseph Affidavit include Benjamin Levitin, Samuel Malamud, Samuel Light, Nachum Pinson, Mendel Shemtov, Abba Paltiel, Yaakov Spritzer, Shmuel Fogelman, Solomon Drimmer, Meier Rhodes, Levi Schapiro, Joseph Spielman, Joseph Gorovitz, and Meier Minkowitz.

ments themselves, or with any authenticating testimony from a qualified witness.[6]

Plaintiffs offer no explanation for their failure to provide copies of the documents listed in their Schedule I and authenticating affidavits from qualified witnesses. With respect to their failure to submit deposition transcripts, plaintiffs contend that this Court's discovery rulings essentially precluded them doing so. However, this contention is unfounded.

The controversy over deposition transcripts began at a conference held on April 10, 1997. During that conference, plaintiffs expressed their concern that, because defendants had taken such a large number of depositions, plaintiffs could not afford to acquire all of the resulting transcripts. Plaintiffs feared that their lack of access to the deposition transcripts would impair their ability to respond to defendants' anticipated motion for summary judgment. Addressing this concern, I directed counsel for the defendants to make available at their offices any transcripts they intended to cite in support of their motion so that they could be read by plaintiffs' counsel. *See* Transcript of April 15, 1997 at 15, Docket Entry 188. Plaintiffs sought reconsideration of the Court's ruling and an order requiring defendants to provide copies of the transcripts at the rate of twenty-five cents per page. By Order dated June 27, 1997, this Court denied plaintiffs' application, stating that "[t]he relief previously granted is adequate and the application for additional relief is denied." *See* Docket Entry 192.

Nevertheless, plaintiffs declined to submit any opposition to defendants' motion for summary judgment and, in July 1997, plaintiffs instead moved for authorization to bring a photocopier to the offices of defendants' attorneys to copy the deposition transcripts previously acquired by the defendants. By Memorandum Order dated January 20, 1998, this Court denied plaintiffs' motion in an order citing cases which hold that the parties to a litigation must bear their own deposition expenses, and that a defendant is not required to supply a plaintiff with copies of deposition transcripts. *See* Order at 3–4, Docket Entry 202. This Court then extended the time for plaintiffs to submit their opposition to the pending motions until March 16, 1998, "to allow plaintiffs time to review and order deposition transcripts, as they should have done long ago." *Id.* at 5. Plaintiffs do not dispute that defendants provided them with access to the transcripts. However, plaintiffs have apparently declined to acquire the transcripts they seek to have this Court consider, relying instead upon their own transcription efforts.

This Court's concern with plaintiffs' failure to support their opposition to summary judgment with deposition transcripts is substantive as well as procedural. To the limited extent that, although not submitted by plaintiffs, the actual transcripts of the

---

**6.** Plaintiffs also rely upon an affidavit submitted by defendant Fischer in another action (Joseph Aff.Ex. D); a letter dated April 14, 1988 purportedly signed by a majority of the Board of Directors of plaintiff CMH (Joseph Aff.Ex. G); a Resolution, dated November 1996, purportedly signed by the officers and directors of CMH authorizing the continuance of this lawsuit (Joseph Aff.Ex. H); Plaintiff's Second Supplemental Response to the "Stock Defendants'' Interrogatories (Joseph Aff.Ex. I); an unsigned document purporting to be an "affidavit" of the now deceased Ruvain Brenenson; a Resolution, dated December 1992, reaffirming and readopting the Council's 1986 election procedures as binding on the Council's membership (Joseph Aff.Ex. J); and affirmations by representatives of various synagogues attesting to the validity of the 1986 Council elections (Joseph Aff.Ex. J). Mr. Joseph has also submitted a reply affidavit dated May 5, 1998, with exhibits including copies of checks payable to Rabbi Yisroel Rosenfeld or Charlie Raffa, co-signed by Rosenfeld and David Fischer (Joseph Reply Aff.Ex. B). In addition, plaintiffs refer to deposition excerpts submitted by defendants in support of their motion for summary judgment. Finally, plaintiffs rely upon several documents previously submitted to the Court in connection with other matters in this case, and upon various opinions and other documents from state court proceedings involving some of the same parties to this action.

testimony cited in the Joseph affidavit have been made available to the Court, comparisons between the testimony "quoted" in the Joseph affidavit and the original transcripts reveals that significant words have been omitted, sentences have been quoted out of order, and statements have been taken out of context.[7]

For example, the Joseph Affidavit on several occasions omits words from witness' testimony which affect the persuasiveness of the witness' testimony. *Compare* Joseph Aff. ¶ 68, footnote (asserting that Levi Schapiro testified, referring to Fischer, that "they give him the money for the community") *with* Schapiro Tr. 76 ("They give the money for the community"); *compare* Joseph Aff. ¶ 73 (asserting that Pinson testified that Fischer carried out the functions of plaintiff CMH "24 hours a day") *with* Pinson Tr. 18–19 (describing Fischer, without specific reference to CMH, as "somebody in the community that was involved with the housing constantly 24 hours a day purchasing buildings, rehabing buildings, fixing up the buildings and making it livable for people in the community"). Similarly, the Joseph Affidavit quotes Rabbi Paltiel as stating that he is "unaware" whether the Council had "any funds for the purchase of real estate." Joseph Aff. ¶ 25. Rabbi Paltiel actually testified that "to [his] knowledge," there were in fact no such funds available. *See* Paltiel Tr. 44.

On another occasion, the Joseph Affidavit combines phrases from the testimony of Nachum Pinson in a misleading manner. The Joseph Affidavit suggests that, in his testimony, Pinson stated that $100,000 would be a low estimate of the payroll received by plaintiffs for administering a program. In this regard, the Joseph Affidavit asserts that "the Court should recall, first, his [Pinson's] testimony quoted at ¶ 28, supra, ... revealing this former governing 'troika' member's estimation that a $100,000.00 'payroll for the director, maybe a secretary' for the neighborhood's senior citizen center would be 'using small numbers.'" Joseph Aff. ¶ 40. In fact, the pertinent deposition testimony, which indicates that the reference to $100,000 as a "small number" was made in the context of a budget for an entire program, reads as follows:

Q. The monies that came to the Council, what was it used for with respect to a particular program?

A. For the benefit of the community. I mean, obviously.

Q. When you say "for the benefit of the community—"

A. People would come for applications if they were entitled to certain funding through these particular agencies. This would be the channel through which they would get their funding. We also had a senior citizens that was funded through—I forget the name, it must have been an agency—there is an agency of the city that was funding specifically senior citizen centers which we also had under our control at the time.

Q. How did the Council pay its staff and employees?

A. Through the—the way programs are generally funded through city, state and federal programs. They don't give you money. They allocate, say a program of say $100,000 and in the program they would have a *payroll for the director, for the assistant director, maybe a secretary.* I mean I'm using *small numbers* in the larger program that

**7.** Defendants have submitted a documentary supplement in support of their motion for summary judgment. The supplement contains virtually all of the deposition excerpts referred to in this Report. In addition, the entire transcript of the deposition of Levi Schapiro has been filed with the Court. *See* Docket Entry 166. Finally, at the Court's request, the parties have supplied the entire transcript of the deposition of Joseph Spielman.

warrants it and the balance of the monies that are left, so to speak, is used for the purpose of the people. But it's always a package where the payroll comes out of programs.

Pinson Tr. 13–14 (emphasis added); *compare* Joseph Aff. ¶ 40.

Plaintiffs' failure to submit a properly supported statement of disputed material facts is itself grounds to accept defendants' statement of material facts as true. *See* Local Civil Rule 56.1(c). Nevertheless, this Court has considered whether the deposition testimony and documents referred to in Mr. Joseph's affidavit, assuming the are accurately described, are sufficient to raise genuine issues of material fact for trial.

### 2. Evidence of the Embezzlement of Grant Funds

The first alleged scheme underlying plaintiffs' RICO claim is that Fischer embezzled funds from plaintiffs totaling approximately twenty million dollars. Plaintiffs assert that they were awarded these funds in the form of grants from various government agencies. However, plaintiffs have failed to come forward with admissible evidence which, if believed, would demonstrate that this alleged fraud ever took place.

First, plaintiffs have failed to demonstrate that they ever received grants from government agencies. For example, plaintiffs have submitted no contracts with government agencies awarding grant funds, or testimony from government officials indicating that their agencies awarded grants to plaintiffs. Similarly, plaintiffs have failed to produce any bank records demonstrating deposits of government funds into accounts they maintained, or the testimony of any director or employee of either plaintiff who is personally familiar with plaintiff's having applied for and received government grants. In contrast, defendants have presented testimony from former Board members indicating that plaintiffs never amassed funds approaching the $20 million described in the complaint. *See, e.g.,* Shemtov Tr. at 31, 34; Pinson Tr. at 30; Levitin Tr. at 21. Although a list of grants is set forth in the Joseph Affidavit, the list is presented in a conclusory manner, without documentary or testimonial support. *See* Joseph Aff. ¶ 40, footnote.

Plaintiffs have also failed to produce competent evidence that defendant Fischer embezzled funds belonging to them. For example, plaintiffs have identified no witness to testify that plaintiffs' bank accounts were stripped of funds without explanation, or that grant monies or donations received by plaintiffs were not expended in the manner intended by the grantor or donor. Similarly, plaintiffs have failed to produce any audit reports or the testimony of a forensic accountant or similar expert, demonstrating that their funds were embezzled or stolen during the course of Fischer's employment. *Cf.* Feit Aff. ¶ 23 (citing testimony indicating that government programs administered by the Council were routinely audited by the sponsoring government agency).

It appears that plaintiffs' primary support for their allegations of embezzlement is the deposition testimony of Yaakov Spritzer and Rabbi Joseph B. Spielman. *See* Joseph Aff. ¶ 20 (note). However, as discussed below, neither of these witnesses testified to personal knowledge of the embezzlement scheme charged in the complaint.

According to the Joseph Affidavit, Spritzer administered a "summer feeding program" sponsored by either the Council or CMH. *See* Joseph Aff. ¶ 36 ("we supplied meals which they had contracted with for the government and we won their bid."), Spritzer explained that his group was paid by the Metropolitan New York Coordinating Council on Poverty, and that he believed that plaintiff Council was "a beneficiary of funds that that organization distributes." *Id.* Spritzer stated that he received "tens of thousands of dollars" for

the food he provided pursuant to the program, estimating the actual amount of his gross receipts as between $30,000 and $80,000. *Id.* Spritzer further testified that he was required to pay ten per cent of his gross receipts to Fischer in return for being selected as a vendor in the summer feeding program. According to Spritzer, the money was to be used "to help either hold apartments, pay for apartments, or buy property [, and the money was given] to Rabbi Fischer as a representative of the housing stock of Crown Heights." *Id.*

Spritzer's testimony fails to raise a genuine question of material fact precluding summary judgment. First, the amount involved—ten percent of Spritzer's gross receipts or $3,000 to $8,000—is so minuscule in comparison to the $20 million charged in the complaint as to suggest that these are not the payments plaintiffs intended to describe. Moreover, apparently in response to having been asked if the payments to Fischer were a "kickback," Spritzer testified, "I wouldn't call it a kickback. *It was from my profit. The money showed up from my profit and loss, but that was a condition I had to fulfill in order to be a vendor for that particular program.*" *Id.* ¶ 37 (emphasis in original). Thus, according to the Spritzer testimony relied upon by plaintiffs, the money he gave to Fischer was derived from *his profits* on the summer feeding program, not from program funds intended for the Council. Presumably, these funds would

have been retained by Spritzer as profits—not turned over to plaintiffs and embezzled from them by Fischer—if Fischer had not demanded that Spritzer make payment. Moreover, plaintiffs have not pleaded in their complaint that Fischer demanded kickbacks from vendors participating in programs plaintiffs sponsored, nor explained how such kickbacks would cause them a RICO injury for which they would have standing to sue.

Most significantly, there is absolutely no indication in the Spritzer testimony cited by plaintiffs, or in any other evidence plaintiffs have put before this Court, that the payments Spritzer asserts he made to Fischer were not applied to the community-oriented purposes for which Spritzer claims they were sought. Indeed, defendants have submitted testimony from individuals who were Council Board members during Fischer's tenure indicating that the Council periodically paid money to landlords to hold apartments until a suitable tenant could be found, without intending thereby to acquire any beneficial interest in the properties it supported. *See, e.g.,* Shemtov Tr. 27–28; Levitin Tr. 23.[8] Although the Joseph affidavit challenges the veracity of these witnesses, plaintiffs present no evidence in admissible form to rebut their statements in this regard, or to suggest that Fischer diverted the monies allegedly paid by Spritzer for plaintiffs' benefit to his own personal use.

8. For example, Mendel Shemtov was asked at his deposition whether the Council assisted landlords from time to time during the years that he was its chairman. He explained that they did help a few landlords, stating as follows:

"A: Let's say we had two instance[s]. One I don't remember who the landlord was, it was on Montgomery Street, he said, I have an apartment I want to rent it out right away. So we asked him please hold it. So he said I'm not going to hold. So some agreed we pay 50 percent or 100 percent of the rent for a month, two, three at the most. If we were successful in getting in a tenant, fine. If not, he just didn't wait any longer, we couldn't pay him any longer. And the same thing we had with

Mr. Popack, he had also houses and a few times we helped him also holding apartments for us."

Q: Any payments that you made to landlords, were these payments open to all landlords in Crown Heights?

A: They were open to all landlords, but I mean we didn't have too many landlords want to cooperate with us. Because they feel it's a lost cause. They felt it's going to be the same as Brownsville and anything else. We were not that successful. We didn't have that much money and there was not a flow of customers, of tenants. We tried the best and we had two or three landlords we worked with.

Shemtov Tr. 27–28.

Plaintiffs also rely upon Spritzer's testimony that "[p]eople who were on the CETA program used to sign checks and return it to Fischer," Joseph Aff. ¶ 38, and that plaintiffs may have obtained funds distributed pursuant to a Section 8 rent subsidy program. *Id.* ¶ 39.[9] As Spritzer's further testimony indicates, however, he lacks personal knowledge sufficient to render admissible his conclusion that Fischer may have obtained CETA or Section 8 funds. Spritzer testified with respect to the CETA program as follows:

> I know individuals who were on the CETA program who had certain arrangement with Chevra Machziket H'Shechuna or the Council, where some of that money *may have been* returned or utilized for the benefit of the community.

*Id.* ¶ 38 (emphasis added). Plaintiffs offer no indication that Spritzer had any personal knowledge regarding the operation of the CETA program or Section 8, or the arrangements any individual participant in these programs "may" have made to remit funds to Fischer on plaintiffs' behalf.

Even if Spritzer did have personal knowledge of CETA or Section 8 funds being paid to Fischer, his testimony would fail to raise a material issue of fact for the same reason that his statements about the summer feeding program are inadequate to defeat summary judgment. Although Spritzer suggests that Fischer may have come into possession of CETA or Section 8 funds in his capacity as plaintiffs' representative, he nowhere states that he is aware of Fischer having converted these funds to his own private purposes. There is simply no evidence in admissible form described in the Joseph affidavit or elsewhere indicating that any funds intended for plaintiffs' benefit were misdirected or embezzled by Fischer or any other defendant sued in this action.

9. CETA and Section 8 are, respectively, government-funded employment and housing

Plaintiffs also rely upon the deposition testimony of Rabbi Joseph Spielman to support their claim of embezzlement. *See* Joseph Aff. ¶ 20, footnote. However, this Court is unable to locate any references to portions of Spielman's deposition which even arguably constitute admissible testimony that defendant Fischer embezzled funds belonging to plaintiffs. Plaintiffs seem to contend that, at his deposition, Spielman identified documents demonstrating Fischer's embezzlement. *See* Joseph Aff. ¶¶ 62–63. However, it is clear from the cited testimony that Spielman is basing his statements not upon his own knowledge, but upon his review of documents, and that he cannot identify the documents he is relying upon with specificity. Indeed, at another point in his deposition, Spielman testified as follows:

A. As I stated before, my own knowledge is only based on the documents that were submitted to you, which is part of this complaint, and not from personal knowledge that I was involved in any form, manner or shape during that period ... that these crimes of excommunicant Fischer were being done.

[Objection omitted]

Q. Look at paragraph 63 of the complaint. The allegation is that Rabbi Fischer converted approximately $20 million in state, city and federal funds that belonged to the Council .... [y]ou have already told us that you have no personal knowledge regarding this matter. But can you identify any document or documents that bear on the alleged conversion of $20 million in state, city and federal finds belonging to the Council and/or CMH?

A. Whatever documents that we had were made available to our counsel, to our attorneys, and available to you through his submitting them to you .... [question omitted] As I said before, that

programs.

I was not involved with the Crown Heights Jewish community of Chevra ... in any form, manner or shape prior to September of 1986, and there I would not have any ... direct involvement in the misappropriations and other allegations of this complaint.

Spielman Tr. 422–23. Clearly, Spielman is not a witness who could offer testimony at trial supporting plaintiffs' claim of embezzlement.

The Joseph Affidavit also refers to testimony of Council Chairman Samuel Malamud. *See* Joseph Aff. ¶¶ 53–56. According to the Joseph Affidavit, Malamud was asked whether Fischer ever received funds from plaintiffs to purchase real estate, but could only speculate in response, stating, "I would think that there was, that Rabbi Gu[r]ary gave him access to those funds to buy." *Id.* ¶ 56. However, when questioned at his own deposition, Gurary stated that he was not aware of Fischer obtaining funds belonging to plaintiffs. Rather, when Rabbi Gurary was questioned about who Fischer took money from, he answered, "All the people. I don't know exactly. I know from the shechuna take away [sic]." Gurary Tr. 37. Gurary was asked to explain his reference to the "shechuna," as follows: "When you say 'the shechuna,' are you referring to a particular organization?" He answered, "Not organization. I don't talking about organization [sic]. About people from the shechuna bought properties from belonging to the people and take away and ask them for the money back [sic]." *Id.* Plaintiffs have plainly failed to demonstrate that Rabbi Gurary will be able to offer testimony at trial that Fischer embezzled funds from them.

Finally, plaintiffs rely on a list of three hundred documents which they refer to as "Schedule I." Joseph Aff.Ex A. However, with few exceptions, plaintiffs have failed to provide the Court with copies of the documents or with testimony authenticating the documents or explaining their relevance to this action. These are critical omissions, because it is not readily apparent from an examination of the list of documents how most of them are claimed to support plaintiffs' allegations of fraud.[10]

Thus, for example, Mr. Joseph refers in his affidavit to several checks as evidence of Fischer's embezzlement. *See* Joseph Aff. ¶ 91. However, plaintiffs have not provided the Court with copies of these checks, and have failed as well to provide any testimony about the accounts on which these checks were drawn, or any limitations on the proper purposes to which funds in those accounts could be applied. Although some of the checks described in the affidavit are made payable to entities with which Fischer is apparently associated, there is no testimony that these entities never loaned money to plaintiffs, never provided services to plaintiffs, and never received funds from plaintiffs for a proper purpose. Moreover, the dollar amount of most of the checks is not indicated, and the largest amount that is stated is $3,900. This dollar amount hardly justifies an inference of impropriety, particularly in the context of an alleged fraud in the amount of $20 million.

---

**10.** Plaintiffs seek to explain their inability to document their charges by accusing Fischer with having absconded with their books and records. *See* Compl. ¶ 125; Joseph Aff. ¶¶ 95–102. At his deposition, Rabbi Spielman stated that, "I only had these smidgens of a record being the preponderance of the record was—more than preponderance, 99.9 percent, was taken by Fischer and is in his possession." Spielman Tr. 95. However, plaintiffs' only evidence with respect to Fischer's alleged theft of the books and records of the Council consists of Spielman's testimony that he was told about this by staff members whose identity he could not recall. *See* Spielman Tr. 32–33 (quoted at Joseph Aff. ¶¶ 96, 98). Plaintiffs have been unable to identify any witness who saw Fischer remove books and records, or who can identify which records are missing. Moreover, Mr. Yarmush, an employee of the Council, testified that a number of records were destroyed to make space. *See* Yarmush Tr. 41.

As a second example, plaintiffs claim that Item 131 on "Schedule I"—their list of documents—"includes a check visibly related to Fischer's purchase of [the Hotel] property drawn on Plaintiff Council's bank account." Joseph Aff. ¶ 80. The Hotel is one of the properties involved in the fraudulent real estate scheme charged by plaintiffs. However, the connection between the check described as Item 131 on Schedule I and the purchase of the hotel is far from clear. The check in question, which plaintiffs have failed to provide to the Court, is described in the Joseph Affidavit as a check payable to Defendant "Crown Montgomery Homes," signed by Yisroel Rosenfeld, in the amount of $1,000. Plaintiffs have failed to provide any testimony to support their claim that this check was related in any way to the purchase of the hotel property, choosing to rely instead on conclusory assertions in the Joseph Affidavit. In short, plaintiffs have failed to submit any testimony describing how the funds represented by these checks were in fact used, or pointed to any evidence that the proceeds of the checks were improperly converted by Fischer.

Unable to point to any evidence demonstrating that Fischer's conduct caused injury either to the Council or CMH, plaintiffs seem to argue that they may stand in the shoes of every individual who gave Fischer funds to invest in real estate and was unhappy with the result. Thus, Rabbi Spielman testified at his deposition that,

> What I'm saying is that the residents and other organizations of Crown Heights have a claim to these properties. If it's called Crown Heights Jewish Community Council or if it's called Va'ad Hakahol is irrelevant. It's the community that has the claim. He worked, he took money from the community—from the people in the community through—through—at some time through the Crown Heights Jewish Community Council, but there again, the bottom line is that the ones that are suing are the residents. We are the

representatives of the residents of Crown Heights.

Spielman Tr. 134. Plaintiffs offer this Court no basis upon which to permit them to sue for damages on behalf of the residents of the neighborhood they purport to serve. Moreover, plaintiffs have failed to come forward with admissible evidence even of their general allegation that Fischer defrauded the residents of Crown Heights. In short, even if plaintiffs had identified individuals who provided Fischer with funds to be used for the benefit of the community, they have mustered no evidence whatsoever that Fischer misused those funds for his own personal gain, or that they would have standing to sue under RICO if he had.

### 3. Evidence of the Real Estate Conversion Scheme

As discussed above, the second alleged scheme underlying plaintiffs' RICO claim concerns a number of real estate transactions conducted by Fischer during his tenure as a CMH or Council employee. Plaintiffs contend that Fischer negotiated reduced prices for these properties by representing that he was acquiring them on plaintiffs' behalf, purchased the properties with plaintiffs' funds, and then deprived plaintiffs of their beneficial interest in the properties by taking title to them in the names of entities he controlled and converting the income they generated and the equity they represented to his own use.

Fischer has submitted an affidavit in support of defendants' motion stating that he acquired the properties described in the complaint with privately raised funds, and was not acting as plaintiffs' agent when he made the challenged purchases. Plaintiffs have failed to rebut Fischer's testimony with evidence indicating that Fischer perpetrated the real estate conversion scheme charged in the complaint. For example, plaintiffs have not submitted testimony from any of the sellers of the real property described in the complaint, stating that they accepted a reduced price

from Fischer because they understood that he was acquiring the properties on plaintiffs' behalf. Nor have plaintiffs identified any donors who assert that they provided plaintiffs with funds or property, only to learn that Fischer converted the property or funds to his own use. Similarly, plaintiffs have presented no financial records, or other proof, indicating that Fischer used funds belonging to them to acquire properties he holds in his own name or through entities under his control.

Plaintiffs' theory of liability appears to be that, as their employee, Fischer owed plaintiffs a duty to participate in real estate transactions *only* as their agent, and not on his own account. Accordingly, argue plaintiffs, any real property Fischer acquired belongs to plaintiffs, whether or not Fischer acquired the property with their funds or obtained some benefit by representing to the seller that he was acting on plaintiffs' behalf.

Plaintiffs have in fact presented evidence indicating that Fischer did act as an agent of the Council, and owed the Council at least some type of duty. For example, plaintiffs have submitted an affidavit filed by Fischer on February 12, 1986, in a lawsuit brought in this District captioned *Wilson v. Carbrook Apartments*, 82 Civ. 1262(MAC). Fischer described himself in that affidavit as "the head of the development of Crown Heights housing which is the housing arm of the Crown Heights Jewish Community Council." *See* Joseph Aff., Ex. D at ¶ 1. Plaintiffs also rely upon a finding made in the course of a state court proceeding that "Fischer's relationship with the Community Council was that of a trust and fiduciary character." *Crown Realty Co. v. Crown Heights Jewish Community Council*, No. 7286/88, slip op. at 16 (Sup.Ct. Kings County Apr. 23, 1993); *see* Joseph Aff.Ex. E. In that case, Justice Vaccaro further found that

Fischer ... held the official title of administrator of Community property. This title allowed Fischer to oversee any property that might be donated to the

Community by individual members ... as well as property otherwise obtained by the Community. Fischer was responsible for determining what entity would take record title to hold any such property, although the beneficial ownership of all such property was to repose with the Community.

*Id.* at 6–7. To further confirm Fischer's authority to act on their behalf, plaintiffs also have listed a number of checks, drawn on the account of plaintiff Council, on which Fischer's name appears as a signatory or joint signatory. *See* Joseph Aff. ¶ 15 & Ex. A.

The evidence with respect to Fischer's relationship with plaintiff CMH is more limited. However, defendant Fischer has admitted that he helped to form CMH. Fischer Aff. ¶ 3. Moreover, certain witnesses have described Fischer's involvement with CMH and its predecessor organization, Chebro. *See, e.g.* Levitin Tr. at 14 ("there was the [C]ouncil, Chebro [a reference to plaintiff CMH] sell shares, I bought for a thousand at that time [sic], he [Fischer] was working, he was the Che[b]ro").

The problem with plaintiffs' position is that it does not logically follow that, because Fischer was authorized to conduct real estate transactions on plaintiffs' behalf, *all* of Fischer's real estate transactions *must necessarily* have been conducted on their behalf. In other words, although plaintiffs may have presented evidence that Fischer was authorized to act as their representative, they have failed to offer any proof indicating that he was in fact acting on their behalf and not for his own account when he acquired the real properties at issue in this case.

For example, plaintiffs have not submitted any employment agreement or contract, or the testimony of a member of either plaintiffs' board at the time Fischer was hired, to demonstrate that Fischer surrendered his right to purchase private property when he went to work for plain-

tiffs.[11] Rather, to support their argument that Fischer lacked the right to acquire real estate in his own name or for his own benefit, plaintiffs rely on a pronouncement of the Crown Heights "Beth Din," a community-based religious organization which apparently exercised some degree of authority over Jewish residents of Crown Heights. *See, e.g.,* Joseph Aff. ¶ 92. Plaintiffs' cite Spielman's testimony that, pursuant to the Beth Din pronouncement,

> [t]he only one that [had] a right to develop property for the good of the community is excommunicant David Fischer and no one else [had] a right to buy property for development. It all [had] to go through excommunicant David Fischer for the purpose of community interest—for the community development.

*Id.,* (quoting Spielman Tr. 272).

However, as Spielman acknowledged, his description of the Beth Din ruling was based on hearsay. *Id.* Indeed, plaintiffs acknowledge in their opposition papers that Spielman lacks personal knowledge of Fischer's real estate transactions. Joseph Aff. ¶ 75. Moreover, the text of the ruling itself fails to support Spielman's characterization of it. Although plaintiffs did not submit the Beth Din ruling in connection with the pending motion, they did provide the Court with a translation of it in 1994. *See* Docket Entry 36, Ex. 4. According to plaintiffs' translation, the Beth Din ruled as follows:

> [T]here are some who buy ... buildings that are abandoned, and they bring into them such neighbors that damage and cause continuous distress to Jewish neighbors, and *they thereby ruin the neighborhood.* The main point is that these [buyers] have no consideration for

anything else, their aim and intention being only to earn profits through *these undesirable neighbors.*

> The Beth Din's ruling, with full severity and force, is that anyone wishing to acquire one of the aforementioned buildings is obligated to have consideration for the state of the neighborhood and the neighbors, and to be in touch previously *regarding this with the Community* Council.

*Id.* (emphasis in original).

Assuming without deciding that a ruling of a Beth Din may give rise to rights and obligations enforceable in this Court, the ruling cited by plaintiffs fails to raise an issue of material fact. First, the ruling by its terms applies only to certain abandoned buildings, and there is no evidence that the properties plaintiffs describe in their complaint fall within the ruling's scope. Second, the ruling does not prohibit individuals from acquiring the buildings to which it applies, nor does it require individuals seeking to acquire such buildings to obtain plaintiffs' prior approval. Rather, the ruling provides only that an individual seeking to purchase an abandoned building should first "be in touch" with plaintiff Council. There is, therefore, no reason to conclude that this Beth Din ruling prohibited Fischer from purchasing real estate for his own benefit, or somehow transformed real estate Fischer acquired on his own into plaintiffs' property.

Indeed, even witnesses whose testimony is relied upon by plaintiffs throughout the Joseph affidavit in opposition to defendants' motion acknowledged that Fischer may have legitimately acquired real property with his own funds or funds he borrowed or raised. These witnesses concede that, if he did so, the acquired real proper-

---

11. Plaintiffs' allegations might be construed as a claim for diverting corporate opportunities, *see Poling Transp. Corp. v. A & P Tanker Corp.,* 84 A.D.2d 796, 796–97, 443 N.Y.S.2d 895, 897 (2d Dep't 1981) (officer's acquisition of property for himself, where corporation had a tangible expectancy in the property, violates duty owed to corporation). Plaintiffs have failed, however, as discussed in the text, to present any evidence that Fischer defrauded them of the opportunity to acquire any particular piece of property. Moreover, absent proof of mail fraud or some other racketeering activity, diversion of a corporate opportunity does not in and of itself constitute a RICO predicate.

ty would not belong to plaintiffs. For example, Abba Paltiel, when asked "how does that follow that every property that Rabbi Fischer bought belonged to the community," answered,

> If the property was purchased by proceeds that came as a result of Chebro [a reference to plaintiff CMH] ... then obviously it belongs to Chebro. If the property was purchased by proceeds from other sources or from his own ... funds, then it doesn't belong. These are things that have to be sorted out.

Paltiel Tr. 82. Similarly, Samuel Malamud was asked, "So to the extent that Rabbi Fischer didn't take any money from [plaintiffs] ... to purchase the hotel, then [plaintiffs] ... would not have a claim to this property?" and answered "If he got the money from private investors or—no." Malamud Tr. 200.

As discussed above, one of the transactions in issue involved Fischer's purchase of a parcel referred to by the parties as the "hotel property." *See* Joseph Aff. ¶ 78 *et seq.* Plaintiffs contend that Fischer acquired this property at a substantially reduced price by representing that he was acting on plaintiffs' behalf. *Id.* The only evidence mustered by plaintiff which even arguably supports this allegation is Malamud's testimony that "there was an option ... to buy that property at a special price. And to my knowledge, Rabbi Fischer said that he is acting on behalf of the community and he exercised that option on behalf of the community." Joseph Aff. ¶ 86 (citing Malamud Tr. at 246–48).

Malamud's testimony is insufficient to defeat summary judgment. First, Malamud gave no indication in his testimony that Fischer's having obtained a reduced price by representing that he was acting on behalf of the community caused any injury *to plaintiffs*. In fact, Malamud testified that he offered to help Fischer raise money to purchase the hotel property, and was asked, "When you made that offer to him, were you going to buy it on behalf of the Council?" Malamud answered, "Buy it

on the Council or under Chebro or whatever, but it would be strictly for the benefit of the community." Joseph Aff. ¶ 83 (quoting Malamud Tr. 210–11, which has not been provided to the Court by the parties). Moreover, there is no indication that plaintiffs—or Malamud—provided any of the funds used to acquire the hotel property. To the contrary, even the evidence cited by plaintiffs indicates that Fischer raised the money himself. *See* Joseph Aff. ¶¶ 87–88 (citing Spritzer's testimony that payments were made "either [by] Fischer or somebody made it in his behalf" and Spielman's testimony that "[e]xactly where the funds came from, I don't exactly recall, whether it was his own or he obtained a loan or he was partial owner, I don't remember that").

Moreover, what it means to acquire property "on behalf of the community" is, at least in the context of this case, a matter of substantial ambiguity. As the Beth Din ruling quoted above suggests, there was great public concern in the Jewish community during the time relevant to this action about the "undesirable neighbors" who were moving into Crown Heights, and the "damage" and "continuous distress" these new neighbors inflicted on the members of the Jewish community there. In this context, an acquisition "on behalf of the community" could well mean one in which the buyer intends to use the property in a manner that is consistent with the desires and values of the Jewish residents in Crown Heights. In this sense, Fischer's acquisition of the hotel property can be understood as a purchase "on behalf of the community." Indeed, as plaintiffs acknowledge, Fischer conveyed a portion of the hotel property to a yeshiva, which operates a school there. *See* Joseph Aff. ¶ 78; *see also* Yehuda Krinsky Aff. ¶ 3 (Feit Aff., Ex. D) (noting that the property was developed into a hotel for the benefit of visitors and a school attended by hundreds of community children); Shemtov Tr. 50–52; Feit Aff. ¶ 57 (testifying that Fischer's purchase "cleaned up a block,"

and that Fischer rejected an opportunity to sell the property at a profit because the buyer had plans to develop the property in a manner inconsistent with the best interests of the community).

In their final effort to support their claims of fraud, plaintiffs rely upon publicly filed title records concerning some of the properties at issue in this case. *See* Joseph Aff. ¶¶ 69, 76, 78, 145. However, plaintiffs have failed to submit the records themselves, or an affidavit or deposition testimony of an individual familiar with them and able to explain how they demonstrate that Fischer defrauded plaintiffs. Accordingly, and for all the reasons stated above, plaintiffs have failed to present evidence raising a genuine issue of fact with respect to their claim that defendants defrauded them in connection with the acquisition of real estate.

### 4. Evidence of Mailings and Monetary Transactions

Plaintiffs have also failed to submit any evidence to establish the jurisdictional elements of the predicate racketeering acts they allege in their complaint. Thus, even if plaintiffs had submitted admissible evidence raising a question of fact with respect to Fischer's alleged embezzlement of grant funds or conversion of real estate, summary judgment in defendants' favor would still be proper.

As noted above, the racketeering acts charged in the complaint are using the mails in furtherance of a scheme to defraud in violation of 18 U.S.C. § 1341, and conducting monetary transactions in proceeds of unlawful activity in violation of 18 U.S.C. § 1957. To establish a violation of Section 1957, a plaintiff must demonstrate that the monetary transactions charged involved property "derived from specified unlawful activity." As discussed in greater detail above, the only "specified unlawful activity" plaintiffs allege in this case are mail fraud and false statements to federally insured banks in violation of 18 U.S.C. § 1014.

To defeat summary judgment, a plaintiff alleging mail fraud must provide specific factual evidence of the content, time, place and speaker of each alleged mailing, and demonstrate the manner in which each alleged mailing furthered the purported scheme to defraud. *See McLaughlin v. Anderson*, 962 F.2d 187, 190–191 (2d Cir.1992) (holding that claims of mail fraud must be asserted with the particularity required by Fed.R.Civ.P. 9(b)); *Living Music Records, Inc. v. Moss Music Group, Inc.*, 827 F.Supp. 974, 982 (S.D.N.Y.1993); *Physicians Weight Loss Ctrs. of Am. v. Creighton*, No. 90–CV–2066, 1992 WL 176992 *12 (N.D.Ohio 1992). Plaintiffs have utterly failed to make this required showing. Indeed, the Joseph affidavit makes no reference at all to any use of the mails in furtherance of the frauds alleged in the complaint.

Similarly, with respect to their claim that defendants violated Section 1014, plaintiffs have failed to identify with specificity even one false statement made by any defendant to a federally insured financial institution. Moreover, even if plaintiffs had established that defendants made false statements to financial institutions, they have made no showing that they suffered any adverse consequence as a result of defendants' misrepresentations, and therefore would not have standing to sue for a violation of Section 1014. Plaintiffs' failure to submit evidence of these required elements of their claims in the face of defendants' wholesale motion provides yet another basis for granting summary judgment against them.

### Conclusion

Plaintiffs have failed to identify admissible evidence sufficient to raise genuine questions of fact for trial with respect to their claims that defendants caused them injury by committing mail fraud or engaging in monetary transactions in property derived from specified unlawful activity. Accordingly, I respectfully recommend that defendants' motion for summary judg-

ment on plaintiffs' RICO claims be granted. I therefore do not address the other pending motions in this report.

This Court's subject matter jurisdiction is premised upon plaintiffs' claims under the federal RICO statute. *See* 28 U.S.C. § 1331. The remaining claims asserted by plaintiffs in their complaint do not raise federal questions and are brought before this court only pursuant to this Court's supplemental jurisdiction. Accordingly, if summary judgment dismissing plaintiffs' RICO claims is granted, plaintiffs' remaining claims should be dismissed without prejudice to further proceedings in state court. *See* 28 U.S.C. § 1367(a), (c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

Any objections to this recommendations set forth in this Report must be served and filed with the Clerk of the Court, with courtesy copies to the chambers of the Honorable Nina Gershon, within ten days of its receipt and in any event no later than December 17, 1998. Failure to file objections within the specified time waives the right to appeal the District Court's Order. *See* Fed.R.Civ.P. 6(a), 6(e), 72; *Small v. Secretary of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989).